# STATE OF MICHIGAN

# COURT OF APPEALS

SHANA ROGERS,

FOR PUBLICATION
August 25, 2015
9:00 a.m.

Plaintiff-Appellee,

v

No. 318395
Otsego Circuit Court
Family Division

DAVID A. WCISEL,

LC No. 08-012687-DS

Defendant-Appellant.

Before: WILDER, P.J., and SERVITTO and STEPHENS, JJ.

STEPHENS, J.

Defendant appeals by delayed leave granted the circuit court order denying his motion to revoke his acknowledgement of parentage. We reverse and remand.

## I. BACKGROUND

Plaintiff, Shana J. Rogers, and defendant, David A. Wcisel, began an "off and on" dating relationship in 2006. On March 12, 2007, plaintiff gave birth to MW. Defendant was present for the delivery of MW and signed an acknowledgement of parentage at the hospital.[1] Plaintiff and defendant continued to reside together for approximately one year after MW's birth before they separated and defendant left the residence. On July 3, 2008, plaintiff, through the Otsego County Prosecutor's Office, filed a complaint for child support against defendant. Defendant filed an answer which admitted to allegations that he was the father of MW, that he was not living with the child, that the child was receiving public assistance, and that he was "of sufficient ability to provide support for the child[] and [had] failed to provide support." As a result, the parties signed a consent order on August 19, 2008, granting plaintiff sole legal and physical custody of MW, requiring defendant to pay $2,670 toward plaintiff's reasonable and necessary confinement expenses, and requiring defendant to pay $442 per month in child support.

---

[1] This Court was not provided with a copy of the acknowledgement of parentage and the document is not a part of the trial court record. For purposes of this opinion, the Court has assumed that the document was duly signed and notarized and was properly executed and filed in keeping with the requirements §§ 3 and 5 of the Acknowledgment of Parentage Act, MCL 722.1001 et seq.

Sometime later defendant began to notice that MW had "physical attributions" that were not his and asked plaintiff for a DNA (Deoxyribonucleic Acid) test. The DNA test results showed that there was a zero percent chance that defendant was MW's biological father. Thereafter, on July 15, 2012, defendant filed a motion requesting that the trial court revoke the parties' acknowledgement of parentage, relieve him of any child support obligations, and reimburse him for the child support expenses he had previously paid. Along with his motion, defendant attached the DNA test and an affidavit in which he averred that he signed the acknowledgement of parentage because plaintiff had represented that he was the only possible father and because he believed that to be true. Plaintiff filed an answer and brief in opposition to defendant's motion. Plaintiff asserted that she informed defendant that there was a possibility that another man was the father, and that defendant merely "changed his mind" about being MW's legal father. Plaintiff requested that the trial court require defendant to post $2,000 in bond to be paid to plaintiff if his motion was denied and hold him in contempt for committing perjury in his affidavit. On August 20, 2012, the trial court ordered "[t]hat the Friend of the Court shall hold all child support received on behalf of Defendant until further order of the Court."

On October 5, 2012, at the hearing on defendant's motion, defendant argued that his affidavit and the DNA test results were sufficient to set aside the acknowledgment of parentage. Plaintiff countered that the trial court could apply the equitable parent doctrine and require defendant to continue supporting the child. The trial court accepted that the acknowledgement of parentage was not correct and plaintiff agreed that the DNA test proved defendant was not MW's biological father. The court however, would not revoke the acknowledgement of paternity absent defendant stating facts that constituted a mistake of fact, newly discovered evidence, fraud, misrepresentation, or duress under MCL 722.1437(2). The court explained that after compliance with MCL 722.1437(2), defendant needed to show that revoking the acknowledgement would not be against MW's best interests. To address these contested issues, a bench trial was held on July 11, 2013.

At trial defendant testified that after he and plaintiff broke up, she informed him that she was pregnant. Defendant believed he was the child's biological father. He stated that he was not aware that plaintiff had sexual relations with another man, and that plaintiff never indicated that he might not be the child's father. Defendant testified that he would not have signed an acknowledgement of parentage if he had known that he was not the child's father. For comparison, defendant testified to a prior child born to plaintiff in 2006 that plaintiff "swore 100 percent" was his. Defendant was present for that child's delivery and was asked to sign the acknowledgment of parentage for that child, but refused because he knew that child could not have been his. Defendant explained that when he asked plaintiff for a DNA test for MW, plaintiff took the position that he was the father. Defendant testified that when he texted plaintiff the results, which indicated that he was not MW's biological father, plaintiff responded that she was "in shock," "sorry," and "always thought that [MW] was [his]." Defendant read texts from plaintiff into the record in which plaintiff agreed that defendant should be removed from MW's birth certificate and stop paying child support. He testified that plaintiff sent him a text message that said, " 'You said she was yours no matter what. That's what hurts the most.' "

Plaintiff testified that she became pregnant at the "end of June, beginning of July" of 2006, and that around that time she had sexual relations with defendant and Justin Beacroft. She

testified that she called defendant to "let him know [she] was pregnant [and] that there could be a 50/50 chance" that he was not the child's biological father. She testified that defendant and Beacroft even joked about not knowing which one of them was the father while they were drinking at a golf course before the child was born. Defendant denied both allegations. Plaintiff testified that the child's due date was changed during her pregnancy and that when she told defendant about this "he looked at me with a dumb look on his face like knowing that it probably wasn't his." However, plaintiff testified that she thought the child would be defendant's based on the new due date. Plaintiff testified that after MW was born, she and defendant only talked about the possibility of her not being his when defendant heard rumors from others in town. When asked what she meant when she texted defendant, "I'm so sorry for everything. I truly did believe she was yours," plaintiff answered, "Truly hoped that it was his. I probably worded it wrong in how I spelt it and worded it. Like I truly did believe it was his and truly hoped that it was his when the DNA test came back." She admitted during cross-examination that she was surprised by the DNA test results.

Beacroft testified that he lived with defendant and plaintiff in 2006, and that he and plaintiff had sexual relations during that time. He testified that in October or November 2006, he told defendant "that things had been going on between" him and plaintiff. Defendant testified that it was in the summer of "2009, 2008" that Beacroft told him that he had sexual relations with plaintiff but that Beacroft did not specify when this occurred. Beacroft testified that plaintiff called him when she found out that she was pregnant and explained that she was not sure if it was defendant's or his. Beacroft testified that it was his understanding that defendant was MW's biological father.

Jami Rogers, plaintiff's mother, testified that plaintiff told her "a month-and-a-half before [the child] was born that defendant might not be the father." Rogers testified that while plaintiff was in labor, she and defendant talked and defendant stated "that he didn't think he was going to be able to go through with this" and that "he didn't know if he could handle the situation." Defendant explained that his statements were in reference to the delivery because he was afraid that he would pass out. Defendant denied ever indicating to plaintiff's mother that he thought the child might not be his.

The court denied defendant's motion on the record at the end of the trial. The trial court believed that defendant's lack of contact with MW after defendant and plaintiff separated "indicat[ed] that [defendant] had some knowledge that perhaps he wasn't the father." The court found the testimony of plaintiff, Beacroft and plaintiff's mother to be more credible and indicated that defendant had doubts as to whether he was MW's father. The trial court found "most persuasive" plaintiff's testimony that defendant said "no matter what, she's mine" which indicated to the court that "there was a question out there as to paternity." Accordingly, the trial court concluded that plaintiff's "version of events [was] more believable" and found that defendant had not met his burden in proving a mistake of fact.

On January 25, 2013, defendant filed a motion for a new trial or reconsideration under MCR 2.611(A)(1)(a), (e), (g), and MCR 2.612(C)(1)(f); a motion to disqualify the trial judge under MCR 2.003(C)(1)(a) and (b); and a motion to stay the order pending appeal under MCR 2.614. After hearing oral argument and allowing the parties to submit briefs regarding the application of the holding in *Bay County Prosecutor v Nugent*, 276 Mich App 183; 740 NW2d

678 (2007), that the presentation of unchallenged DNA evidence is sufficient to establish a mistake of fact, the trial court denied defendant's motion for a new trial and for disqualification.

## II. REVOCATION OF ACKNOWLEDGEMENT OF PATERNITY

Defendant argues that the trial court erred in denying his motion to revoke his acknowledgement of paternity when he set forth sufficient facts to demonstrate a mistake of fact. We agree.

This case arises under the Revocation of Paternity Act (RPA), MCL 722.1431 *et seq*. "When reviewing a decision related to the Revocation of Paternity Act, this Court reviews the trial court's factual findings, if any, for clear error." *Glaubius v Glaubius*, 306 Mich App 157, 164; 855 NW2d 221 (2014). " 'The trial court has committed clear error when this Court is definitely and firmly convinced that it made a mistake.' " *Parks v Parks*, 304 Mich App 232, 237; 850 NW2d 595 (2014) (citation omitted). The proper interpretation and application of a statute is a question of law, which this Court reviews de novo. *Coblentz v Novi*, 475 Mich 558, 567; 719 NW2d 73 (2006).

"The principles of statutory interpretation are well established." *Hodge v US Sec Assoc, Inc*, 306 Mich App 139, 152; 855 NW2d 513 (2014). The goal of statutory interpretation is to give effect to the Legislature's intent. *Bay County Prosecutor*, 276 Mich App at 187. If a statute's language is clear, this Court assumes that the Legislature intended its plain meaning and enforces it accordingly. *Id*. In doing so, "every word should be given meaning, and we should avoid a construction that would render any part of the statute surplusage or nugatory." *Id*. (citations and internal quotation marks omitted). "While generally words and phrases used in a statute should be assigned their primary and generally understood meaning, words and phrases which have technical or special meaning in the law should be construed according to that technical or special meaning[.]" *Michigan Mut Ins Co v Farm Bureau Ins Group*, 183 Mich App 626, 631; 455 NW2d 352 (1990). "Statutory language should be construed reasonably, keeping in mind the purpose of the act, and to avoid absurd results. *Hodge*, 306 Mich App at 152 (citations and internal quotation marks omitted).

"[I]n order to revoke an acknowledgement of parentage, an individual must file a claim as provided under the [RPA]." MCL 722.1007(h). MCL 722.1437 governs an action for the revocation of acknowledgment of parentage. MCL 722.1437(1) of the RPA provides that "the mother, an acknowledged father, an alleged father, or a prosecuting attorney" may file an action for the revocation of an acknowledgement of parentage within three years after the child's birth or within one year after the acknowledgement of parentage is signed, whichever is later. These timing requirements, however, do not apply to actions "filed on or before 1 year after the effective date of this act," which was June 12, 2012. *Id*. Defendant filed his motion to revoke the acknowledgement of parentage on July 15, 2012, within one year after the effective date of the RPA.

MCL 722.1437(2)[2] provides that:

An action for revocation under this section shall be supported by an affidavit signed by the person filing the action that states facts that constitute 1 of the following:

(a) Mistake of fact.

(b) Newly discovered evidence that by due diligence could not have been found before the acknowledgement was signed.

(c) Fraud.

(d) Misrepresentation or misconduct.

(e) Duress in signing the acknowledgement.

Once a court determines that the affidavit is sufficient, the court is then required to "order blood or tissue typing or DNA identification" under MCL 722.1443. MCL 722.1437(3). "The person filing the action has the burden of proving, by clear and convincing evidence, that the acknowledged father is not the father of the child." MCL 722.1437(3). An "acknowledged father" is "a man who has affirmatively held himself out to be the child's father by executing an acknowledgment of parentage under the acknowledgment of parentage act." MCL 722.1433(1). In order to have prevailed in having the acknowledgement of parentage revoked the defendant must have submitted 1) a signed affidavit containing facts sufficient, in this case, to make up a claim of mistake of fact; and 2) the results from blood, tissue or DNA testing. MCL 722.1437(3). This evidence, taken together, must have clearly and convincingly proved that defendant was not the father of the child. MCL 722.1437(3).[3]

In this case, the court received the DNA test results at the same time it received defendant's affidavit. Neither plaintiff nor the trial court refuted the validity of the DNA results. The bench trial was held to test the sufficiency of the affidavit. Both the trial court's oral opinion after trial and its written opinion on reconsideration denied defendant relief for failure to

---

[2] As of March 17, 2015, this section will be at MCL 722.1437(4). 2014 PA 368.

[3] There is disagreement between panels of this Court as to whether a best interest analysis is to follow in a revocation of an acknowledgement of paternity action after the trial court's consideration of the affidavit and blood, tissue or DNA results. See *Helton v Beaman*, 304 Mich App 97; 850 NW2d 515 (2014), where the Court acknowledged that in *In re Moiles*, 303 Mich App 59; 840 NW2d 790 (2013), rev'd in part 495 Mich 944 (2014), "this Court held that a circuit court is not required to make a best-interest determination under MCL 722.1443(4) when revoking an acknowledgment" *Helton*, 304 Mich App at 106, but later applied a best interest analysis reasoning that "[a]n automatic revocation of parentage upon receipt of DNA results indicating that the plaintiff is the father would be contrary to the history and purpose of Michigan's laws, which require consideration of children's best interests before ordering unwarranted and traumatic disruptions in children's lives." *Id.* at 109, n 9.

establish a mistake of fact.[4]  In its oral opinion, the trial court stated that the testimonial evidence presented at trial established that the defendant "had some knowledge that perhaps he wasn't the father."  The court relied on several items of proof in reaching its' conclusion.  The court first highlighted the fact that defendant was not in MW's life after his relationship with plaintiff ended.  The court also credited the statements attributed to defendant by his mother and plaintiff.  Defendant's mother testified that defendant said, "I can't go through with this."  Plaintiff testified that defendant said, "no matter what, she's mine," and that defendant did not seek a DNA test earlier because he said he "did not want to know then."  In its opinion for reconsideration, the court held that "DNA test results could not create a mistake of fact where Defendant was already doubtful of his biological fatherhood status."

Our Supreme Court has held "that the parties' knowledge of the possibility that respondent was not the biological father of the child" is insufficient to demonstrate fraud or misrepresentation.[5]  However, we do not have the same clarity for the instance of mistake of fact.

In the case of *Bay County Prosecutor*, a panel of this Court concluded that the trial court erred in holding that the plaintiff had failed to establish a mistake of fact.  *Id*. at 189.  *Bay County Prosecutor* was decided under MCL 722.1011, the predecessor statute to MCL 722.1437.  *Id*.  In that case, the defendant, despite having had a vasectomy years earlier, believed that he had fathered the child.[6]  *Id*. at 185.  Based on that belief, the defendant signed the acknowledgment of parentage.  *Id.*  Months later it was learned that defendant's fourteen-year-old son actually impregnated the defendant's girlfriend.  *Id*. The defendant's girlfriend filed a complaint to revoke his acknowledgment of parentage.  *Id*. at 185-186.  The trial court held that "[b]ecause defendant intended to be the child's father when he signed the affidavit of parentage, and because he intended to remain as the father after he learned that he was not the biological father, there was no mistake of fact that would justify revocation of defendant's acknowledgment of parentage."  *Id*. at 186-187.  A panel of this Court reversed, *Id*. at 185, reasoning:

> Plaintiff established that when defendant signed the affidavit of parentage, defendant believed that he was the biological father of the child. Plaintiff also established that a DNA test later determined that defendant's son, and not defendant, was the biological father. Presentation of the unchallenged DNA evidence was sufficient to establish a mistake of fact. See *Sinicropi*, supra at 176 n. 14, 729 N.W.2d 256. Regardless of whether defendant intended to be the father when he signed the affidavit of parentage, and whether he intended to remain the legal father after he learned that he was not the child's biological father, the

---

[4] The trial court explained that because it did not find a mistake of fact, there was no need to consider the equities of the case that would include how the child's best interests would be affected by revocation of the acknowledgement.

[5] *In re Moiles*, published order of the Michigan Supreme Court, filed February 21, 2014, (Docket No. 148094).

[6] The defendant's belief that he could have fathered a child after a vasectomy was based on defendant's prior girlfriend also having claimed that he impregnated her after his vasectomy before she miscarried.  276 Mich App at 185.

evidence established that defendant's decision to acknowledge paternity in this case was based, at least in part, on a mistaken belief that he was, in fact, the biological father. [*Id*. at 190.]

In *Bay County Prosecutor*, the Court found the defendant's belief that he was the biological father at the time of signing the acknowledgement of parentage as well as the unchallenged DNA evidence to be sufficient to establish a mistake of fact, and that defendant's intention to be and remain the child's father regardless of biology irrelevant.

In the case of *Sinicropi v Mazurek*, 273 Mich App 149; 729 NW2d 256 (2006), a panel of this Court affirmed the trial court's finding of a mistake of fact. 273 Mich App at 176 n 14. *Sinicropi* was also decided under MCL 722.1011, the predecessor statute to MCL 722.1437. *Id*. at 176. In *Sinicropi*, the defendant had dated Martin Powers, then briefly dated the plaintiff, and then resumed her relationship with Powers. *Id*. at 153. During the defendant's brief relationship with Sinicropi, a child was conceived. *Id*. Powers believed that he fathered the child and signed the acknowledgement of parentage. *Id*. Powers and the plaintiff again separated and in 2004 were engaged in a custody dispute over the child. *Id*. It was during that time that DNA testing was done revealing that Sinicropi was the child's biological father. *Id*. at 153-154. The trial court denied the defendant's request to revoke Powers' acknowledgment of parentage, granted Powers physical custody, determined custody to Sinicropi would not be in the child's best interests, and ordered the defendant and Sinicropi to pay child support to Powers. *Id*. at 154-155. On appeal, a panel of this Court remanded the case to the trial court for a consideration of the equities of the case. *Id*. at 176. The Court did note however, that on remand "[t]here [was] no need to review whether there was a mistake of fact regarding paternity or whether there [was] clear and convincing evidence that Powers [was] not the biological father given the unchallenged DNA evidence and the parties' agreement that Sinicropi fathered the child." *Id*. at 176 n 14. In *Sinicropi*, the Court found the unchallenged DNA evidence and the fact that no one disputed Sinicropi was the child's biological father as sufficient evidence to establish a mistake of fact.

In the case of *Helton v Beaman*, 304 Mich App 97, 105; 850 NW2d 515 (2014)[7], a panel of this Court, under the same version of the RPA at issue here, concluded that a mistake of fact existed to proceed with revocation of the acknowledgement of paternity. *Id*. at 105. In *Helton*, defendants, Lisa and Douglas Beaman, were in a relationship for several years. *Id*. at 100. During a brief separation in the fall of 2002, Lisa had sexual relations with plaintiff, Matthew Helton. *Id*. Lisa gave birth to a child in June 2003, before she and Douglas were married. *Id*. They both signed an acknowledgement of parentage at the hospital acknowledging Douglas as the child's father. *Id*. Although the Beamans raised the child as part of their family, they allowed Helton to interact with the child "periodically." *Id*. at 101. When the child was two months of age, Helton requested a DNA test and the Beamans agreed. *Id*. Because Helton initially failed to pay for the DNA test, the test results, which confirmed that Helton was the child's biological father, were not obtained until 2006. *Id*. Four years later, Helton filed a complaint seeking an order of filiation and parenting time, but it was dismissed by stipulation.

---

[7] Application for leave was granted. *Helton v Beaman*, published order of the Michigan Supreme Court, filed September 24, 2014, (Docket No. 148927).

*Id.* Approximately two years after that, Helton brought suit under the RPA and requested summary disposition in his favor based solely on the DNA test results. *Id.* The trial court denied Helton's motion for summary disposition because "the DNA results standing alone were insufficient to establish by clear and convincing evidence that defendants' acknowledgement of parentage should be set aside." *Id.* at 102. The trial court then held a bench trial and, after finding Lisa's testimony more credible than Helton's, concluded that it was in the child's best interests to deny Helton's request to revoke the Beamans' acknowledgement of parentage. *Id.* The trial court specifically acknowledged the fact that Helton had no parental relationship with the child. *Id.*

> On appeal, this Court concluded that
>
> Helton's assertion of mistake of fact is a sufficient basis to proceed with the revocation action. The DNA evidence supports Helton's attestation that he is the child's biological father, and the trial testimony indicates that defendants mistakenly believed that Douglas was the child's biological father. When a defendant's decision to sign an affidavit of parentage was based in part on a mistaken belief that he is the child's biological father, that mistaken belief constitutes a mistake of fact sufficient to proceed with a revocation action. [*Id.* at 105.]

In *Helton*, the Court found the DNA evidence and Douglas' mistaken belief that he was the father at the time of signing the acknowledgement as sufficient evidence to establish a mistake of fact.

Defendant heavily relies on *Bay County Prosecutor* and *Sinicropi* to contend that his unchallenged DNA test results alone are sufficient to establish a mistake of fact. We decline to adopt defendant's position that unchallenged DNA evidence alone is sufficient to establish a mistake of fact under the RPA. The holdings in *Bay County Prosecutor* and *Sinicropi* each required something in addition to DNA evidence to find a mistake of fact. In *Bay County Prosecutor*, the court found that the additional fact that defendant had some belief that he was the biological father at the time of signing the acknowledgement of parentage created the mistake of fact. It is noteworthy that the defendants in *Bay County Prosecutor* had a scientific reason to doubt his biological connection, but still had some thought or perhaps, hope that he was the biological parent. 276 Mich App at 190. In *Sinicropi*, the court relied on the parties' agreement after the fact that plaintiff fathered the child to support the mistake of fact. 273 Mich App at 176 n 14. In *Helton*, as in *Bay County Prosecutor*, Douglas held the mistaken belief that he was the biological father at the time of signing the acknowledgement. 304 Mich App at 105.

Simply put, biology does not control either an acknowledgment of paternity or its revocation. Our Supreme Court has held that "an acknowledging father is not required to attest that he is the biological father."[8] The definition of an "acknowledged father" does not include any reference to a man being the biological father of a child. MCL 722.1433(1). A man is

---

[8] *In re Moiles*, published order of the Michigan Supreme Court, filed February 21, 2014, (Docket No. 148094).

considered to be the natural father of a child born out of wedlock merely by joining the mother in completing and signing an acknowledgement of parentage before a notary. MCL 722.1003(1)-(2). The undisputed fact that a man is not a child's biological father, as proven by clear and convincing evidence through blood, tissue or DNA, does not establish a mistake of fact. Biological evidence is rather a second and separate factor to be considered in the revocation of an acknowledgment of parentage after the trial court finds the moving party's affidavit sufficient under MCL 722.1437(2).[9]

There is no definition of "mistake of fact" in the RPA or the Acknowledgement of Parentage Act, MCL 722.1001 *et seq*. However, the Legislature is presumed to be aware of existing law when drafting new laws. *AFSCME v Detroit*, 267 Mich App 255, 269; 704 NW2d 712 (2005). Since there is no indication in the language of the RPA that the Legislature intended to alter the meaning of the term "mistake of fact" as understood in our law, it is appropriate, therefore, to look to the definition used in other cases. In *Montgomery Ward & Co v Williams,* a mistake of fact was defined as "a misunderstanding, misapprehension, error, fault or ignorance of a material fact, a belief that a certain fact exists when in truth and in fact it does not exist." 330 Mich 275, 279; 47 NW2d 607 (1951). Since *Montgomery Ward* was decided in 1951, this Court has consistently cited the same definition. See *Sentry Ins v Claims Co Int'l, Inc*, 239 Mich App 443, 447; 608 NW2d 519 (2000); *Bay County Prosecutor*, 276 Mich App at 189-190; *In re Luin Gyle Atterberry Revocable Trust*, unpublished opinion per curiam of the Court of Appeals, issued October 11, 2012 (Docket No. 307850); and *Zigmond Chiropractic, PC v AAA Michigan,* unpublished opinion per curiam of the Court of Appeals, issued July 25, 2013 (Docket Nos. 300643, 304756, 305741, 306048, 306455, 306790).

In applying the definition from *Montgomery Ward*, we conclude that the trial court committed clear error in not finding that defendant had established a mistake of fact. A mistake of fact is "a belief that a certain fact exists when in truth and in fact it does not exist." 330 Mich 275, 279. The trial court found that the defendant had doubt about whether he was the biological father when he signed the affidavit of parentage and that, therefore, proofs on mistake of fact failed. The law, however, does not require that a party have no knowledge that a fact might be untrue to create a mistake of fact. Instead, the party must act in part upon an erroneous belief. The trial court specifically rejected the idea that "a mistake of fact can be found where a belief is only partial or where doubt about that belief is suspect." However, *Helton* and *Bay County Prosecutor* are inapposite.

We conclude that such evidence is sufficient under MCL 722.1437(2) to establish a mistake of fact.

Accordingly, we reverse the trial court's order denying defendant's motion to revoke his acknowledgement of parentage and remand this matter to the trial court for proceedings

---

[9] See *Helton v Beaman*, 304 Mich App at 103 n 4 ("We address the affidavit because a determination of the sufficiency of the affidavit is a requisite step in the analysis prescribed by MCL 722.1437.")

consistent with this opinion.  We do not retain jurisdiction.

/s/ Cynthia Diane Stephens
/s/ Kurtis T. Wilder
/s/ Deborah A. Servitto